## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS, SPRINGFIELD DIVISION

| | | |
|---|---|---|
| DANIEL H. DIERKING, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 17-cv-3128 |
| | ) | |
| NANCY BERRYHILL, Acting | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

TOM SCHANZLE-HASKINS, U.S. MAGISTRATE JUDGE:

Plaintiff Daniel Dierking appeals from the denial of his application for

Social Security Disability Insurance Benefits (DIB) under Title II and

Supplemental Security Income (SSI) under Title XVI of the Social Security

Act (collectively Disability Benefits).  42 U.S.C. §§ 416(i), 423, 1381a and

1382c.  This appeal is brought pursuant to 42 U.S.C. §§ 405(g) and

1383(c).  Dierking filed a Motion for Summary Judgment and Memorandum

of Law (d/e 9).  The Defendant Commissioner filed a Motion for Summary

Affirmance (d/e 10).  This matter is before this Court for a Report and

Recommendation.  For the reasons set forth below, this Court recommends

that the Decision of the Commissioner should be reversed and remanded

for further proceedings.

<u>STATEMENT OF FACTS</u>

Plaintiff Dierking was born on June 14, 1982.  He completed high school.  He previously worked as a factory machine operator helper, dishwasher, and cashier.  He last engaged in substantial gainful activity before January 6, 2012.  Dierking suffers from obstructive sleep apnea, narcolepsy, and hypersomnia.  R. 34-35, 45, 361-62.

On April 23, 2012, Dierking's wife called Dierking's primary care physician Dr. Tim Lyons, M.D. asking for a referral to a specialist because of Dierking's sleep disturbance problems.  Dr. Lyons referred Dierking to neurologist and sleep specialist Dr. Ajitesh Rai, M.D.  Dr. Lyons's noted that Dr. Rai was taking new patients and was accepting "the medical card." R. 315.

On June 14, 2012, Dierking's wife called Dierking's primary care physician Dr. Tim Lyons, M.D. asking for a referral to an allergist because over the counter allergy medicines were not working for Dierking.  Dr. Lyons made the referral.  R. 316.

On June 27, 2012, Dierking underwent a sleep study.  R. 288-89. The study showed near normal sleep efficiency, delay in REM latency, mild obstructive sleep apnea syndrome, and mild snoring.  R. 289.

On July 5, 2012, Dierking saw Dr. Rai for a follow-up on his sleep study.  R. 369-73.   The sleep study showed mild sleep disordered breathing.  Dr. Rai scheduled a second sleep study with use of positive airway pressure to determine the correct pressure level to use with a Continuous Positive Airway Pressure (CPAP) machine during sleep.  Dr. Rai noted, "I suspect the patient has primary hypersomnia.  Consider stimulant therapy following compliant positive pressure therapy if the symptoms persist."  R. 371.

On July 23, 2012, Dierking underwent a second sleep study.  261-73. Prior to the study, Dierking completed the first part of a form entitled Sleep Questionnaire.  R. 269-71.  Dierking reported that the day had been unusual because he did not take a nap that day.  He reported that he slept eight hours the night before and eight hours the night before that.  Dierking selected the following option to describe how he felt, "Definitely not at peak; low motivation, may feel tired, fatigued; remaining attentive and focused does not require conscious effort."  R. 269.  Dierking completed the second portion of the form after the test.  Dierking reported that he thought he slept eight hours and woke up twice during the night.  Dierking reported that he felt about the same; he felt drowsy and he could go back to sleep.  Dierking

reported that he tolerated the CPAP well and would use a CPAP at home if prescribed.  R. 271.

The July 23, 2012, study showed that positive airway pressure was effective in treating Dierking's mild obstructive sleep apnea.  Dr. Rai recommended Dierking use a CPAP with a setting of 6 cm pressure while sleeping at night.  R. 272.

On November 9, 2012, Dierking saw Dr. Rai.  Dr. Rai reviewed Dierking's sleep study.  R. 364-68.  Dierking reported that he was using a CPAP machine at night while sleeping.  Dierking said he did not use the CPAP when he had upper airway congestion, but otherwise he was compliant.  Dierking reported that his hypersomnia improved significantly with the CPAP machine.  Dierking reported that when he was able to use the CPAP throughout the night, he awoke rested and had significant work improvement in activity and alertness.

Dierking's Epworth Sleepiness Scale score was 9.  The Epworth Sleepiness Scale is a measurement of a person's degree of daytime sleepiness at a given point in time.  A person's score on the Epworth Sleepiness Scale is determined from the answers to a brief questionnaire. A score of 0-5 indicates normal daytime sleepiness; a score of 6-10 indicates higher normal daytime sleepiness; a score of 11-12 indicates mild

excessive daytime sleepiness; a score of 13-15 indicates moderate

excessive daytime sleepiness; and a score of 16-24 indicates severe

excessive daytime sleepiness.  About the ESS, located at

http://epworthsleepinessscale.com/about-the-ess/, viewed March 26, 2018.

Dr. Rai noted that he would consider stimulants if symptoms failed to

improve completely.  R. 364.

On February 5, 2013, Dierking saw Dr. Lyons for pain in his wrist.  R.

304-06.  Dr. Lyons noted that Dierking had no active problems.  Dr. Lyons

noted no recent change in sleep.  R. 304.  Dr. Lyons assessed a sprained

wrist and prescribed anti-inflammatory medication.  R. 306.

On May 7, 2013, Dierking completed a Function Report—Adult Form.

R. 163-70.  Dierking reported that he could not work because, "I can't stay

awake to perform at work and I fall asleep behind the wheel of my car when

I drive so I don't have a license anymore."  R. 163.  Dierking stated that he

usually got up, fed the pet dog, prepared breakfast for his children, and

then taught his children until 3:00 p.m.  Dierking repeated that he could not

work because he could not stay awake.  R. 164.  Dierking prepared

complete meals daily.  He took an hour to prepare meals.  He also did

laundry, dishes, and picked up the yard.  He said that he needed someone

to keep him going or he would "set down and nap."  R. 165.

Dierking left the house daily.  He walked, rode a bicycle, and rode in cars.  He did not drive because he fell asleep behind the wheel.  He shopped for groceries once a month.  The monthly shopping took three to four hours.  R. 166.  Dierking said his hobbies were "building, fishing, and shooting guns."

Dierking said he had to be reminded to go places.  He said he fell asleep walking.  He said that he was too tired to perform tasks sometimes.  He opined he could walk a mile and pay attention for up to an hour.  He said he finished what he started; could follow written instructions, but not oral instructions; could get along with authority figures; he could handle stress; and he could handle changes in routine.  R. 169.  Dierking concluded the Function Report—Adult form by stating, "I was told by an employer that I am unhierable (sic) because I can't stay awake long enough on the job.  if I set down to long doing nothing or nothing to keep my mind busy I will sleep."  R. 170.

On July 3, 2013, Dierking saw physician's assistant Krista Wellenkamp, PA-C, to treat a wart on the second finger on his right hand.  Dierking reported that he was feeling fine.  Wellenkamp noted no active problems.  Wellenkamp noted that Dierking's general appearance was

"well-appearing," "awake," "alert," "active," and "in no acute distress."
Wellenkamp treated the wart.  R. 300-01.

On September 19, 2013, Dierking saw Dr. Rai.  R. 359-63.   Dierking
reported using the CPAP machine at night, but having difficulty staying
awake during the daytime.  His Epworth Sleepiness Scale score was 22.
Dr. Rai noted that Dierking was not compliant with keeping follow up
appointments "primarily because of in able (sic) to afford his payments."
Dr. Rai prescribed Adderall.  Dr. Rai noted that Dierking's insurance would
not cover either Nuvigil or Provigil, and Dierking could not afford these two
medicines.  R. 359.  Dr. Rai listed obstructive sleep apnea, narcolepsy, and
hypersomnia as Dierking's chronic problems.  R. 361-62.

On October 10, 2013, Dierking completed a Function Report—Adult
Form.  R. 190-98.  Dierking said that he could not work because he had
issues staying awake.  He said he could not drive because he could not
stay awake behind the wheel.  R. 190.  Dierking said he usually woke up
about 7:30 a.m. He fed his children.  His wife worked outside the home.  He
taught his children at home for two hours.  He said they would "take a short
break for a nap."  He then prepared lunch.  He graded schoolwork in the
afternoon.  R. 191.  He said he then did dishes, folded laundry, dozed "off a

little bit," graded papers, prepared supper, and played video games.  He said he fell asleep playing video games about 10 p.m.  R. 197.

Dierking indicated he has fallen asleep while taking a shower, cooking, sitting on the toilet.  R. 191.  His wife reminded him to take his medication.  R. 191.  Dierking said he did the housework and yardwork.  He took short naps while doing chores.  R. 192.

Dierking said he walked, rode a bicycle, and rode in cars. His wife would not let him drive because he wrecked a car by falling asleep while driving.  He stated she prevented other accidents by waking him up while he was driving.  He said he went grocery shopping monthly.  A shopping trip took three hours.  R. 193.

Dierking listed his hobbies as playing video games, riding a bicycle, fishing, "most anything outdoors," and building things.  He said he played video games daily "until I fall asleep."  He fished when he could get a ride and stay awake.  R. 193.  Dierking spent time with friends and family and attended church.  He went to church three times a week.  He ushered at church two to four times a month.  R. 194.  Dierking said his in-laws got angry with him when he fell asleep at their house when visiting.  He said he stayed home as much as possible because he did not want to fall asleep in public.  R. 195.

Dierking said he fell asleep standing, sitting, and talking.  He had trouble concentrating because he had a hard time remembering what he was doing when he dozed off and then woke up.  He opined that he could pay attention 10 to 25 minutes; could follow written instructions; had some difficulty following oral instructions because he sometimes did not hear instructions completely; could get along with authority figures fairly well.  He said he was "fairly good" at handling stress and changes in routine, but sometimes he got "over stressed."  R. 196.

Dierking said that Dr. Rai prescribed medications, but his insurance did not cover them.  Dierking said that Dr. Rai gave him a sample of Nuvigil.  Dierking said that the Nuvigil did not have any effect on his alertness.  R. 198.

On October 21, 2013, state agency physician Dr. B. Rock Oh, M.D., opined that Dierking's medically determinable impairments could not reasonably be expected to produce symptoms.  R. 58.  Dr. Oh stated the following reason for his opinion:

> Claimant has a diagnosis of sleep apnea with complaints of daytime sleepiness. Sleep studies confirmed impairment, but showed no functional limitations. Therefore, impairment is considered to be non-severe.

R. 59.

3128-SEM-TSH    # 13    Filed: 07/23/18    Page 10 of 23

On June 3, 2014, state agency physician Dr. Lenore Gonzalez, M.D., concurred with Dr. Oh's opinion that Dierking's medically determinable impairments could not reasonably be expected to produce symptoms. Dr. Gonzalez stated the same reason for her opinion as the one given by Dr. Oh. R. 72.

On October 23, 2014, Dierking saw Dr. Rai. Dierking reported using the CPAP machine. R. 354-58. Dierking reported having problems with daytime sleepiness. Dr. Rai assessed that Dierking's narcolepsy was uncontrolled during the daytime. Dr. Rai stated that Nuvigil and Adderall were not effective. Dierking's Epworth Sleepiness Scale score was 22. Dr. Rai prescribed Xyrem. Dierking was to take the Xyrem twice each night. R. 354.

On November 25, 2014, Dierking saw Dr. Rai. R. 349-53. Dierking reported that he continued to use his CPAP machine at night. Dierking reported a dramatic improvement in his daytime alertness after starting to take Xyrem. He took Xyrem before going to sleep at 11 pm, and again at 2 am. Dierking said he did not even take a nap at church. His Epworth Sleepiness Scale score was 3. Dr. Rai continued the Xyrem medication and CPAP machine. R. 349.

Page **10** of **23**

On March 31, 2015, Dierking saw Dr. Rai.  R. 344-48.  Dierking reported that he was using his CPAP.  He reported feeling refreshed after a night's sleep.  Dierking reported that he was also extremely sleepy during the daytime.  Dierking reported that when he was on Xyrem he was extremely alert during the daytime, but not after he stopped taking the medication.  Dierking was waiting approval of the Xyrem by his insurance carrier.  Dierking's Epworth Sleepiness Scale was 19.  Dierking reported taking multiple daytime naps.  R. 344.

On June 25, 2015, Dierking completed a Work Activity Report—Self-Employment form.  R. 233-37.  Dierking reported that he began a lawn mowing business with his wife on April 11, 2015.  He reported that he made $215 in April 2015, $808 in May 2015, and $370 in June 2015.  He said he worked 16 hours a month.  He said his wife did the scheduling, bookkeeping, and driving.  His wife also drove the riding lawn mower.  Dierking used a push mower and trimmer.  R. 234.  Dierking said he worked two hours, rested, and then worked two more hours.  R. 236.

On June 29, 2015, Dierking saw Dr. Rai.  R. 339-43.  Dierking reported that he was using his CPAP at night.  He reported that the Xyrem medication was partially effective.  He reported that he was not taking the second dose at night.  Dr. Rai recommended following a consistent, set

sleep rhythm and schedule.  Dr. Rai also encouraged Dierking to take both doses of Xyrem.  Dierking's Epworth Sleepiness Scale was 12.   R. 339.

September 28, 2015, Dierking saw Dr. Rai.  R. 334-38.  Dierking reported that his CPAP mask and the water chamber on his CPAP machine broke down.  Dierking also reported improvement with his daytime sleepiness with Xyrem, but control was still suboptimal.  Dr. Rai recommended that Dierking continue using the CPAP machine when he slept.  Dr. Rai recommended increasing the dosage of the Xyrem. Dierking's Epworth Sleepiness scale was 10.  R. 334.

## THE EVIDENTIARY HEARING

On January 14, 2016, the Administrative Law Judge (ALJ) conducted an evidentiary hearing.  R. 29-51.  Dierking and his attorney appeared by video conference.[1]

Dierking testified.  Dierking testified that he lived in a house with his wife and four children, ages 5, 7, 9, and 12.  Dierking completed high school.  R. 34.  He said he gave up his driver's license because he kept falling asleep while driving.  R. 35.  Dierking said he had been in accidents several times because he fell asleep driving.  R. 36.

---

[1] Vocational expert James Israel appeared by telephone.  R. 31.  His testimony is not relevant to the issues raised by Dierking's appeal.

Dierking said that on January 6, 2012, "I was trying to work at first, but an employer told me I was a liability and they would not hire me." He said he was a liability because he would fall asleep on the job and was at risk of getting hurt. Dierking said he fell asleep at work several times. He said he lost four jobs because he fell asleep at work. R. 35.

Dierking testified that he was taking Xyrem for his condition. He said the medication helped, but he still got drowsy during the day. R. 36. He indicated he was still falling asleep during the day on the Xyrem. R. 37. Dierking said he usually fell asleep twice a day and slept for three to four hours each time. He felt rested after a nap, but an hour later, he was tired again. Dierking stated he had a CPAP machine and used it every night. R. 37. Dierking opined that he did not believe he could work a full-time job even with though he was taking the Xyrem. R. 38.

Dierking said he took the Xyrem at 10:00 p.m. and 3:00 a.m. He said the medicine put him in a deep sleep. He said he sometimes did not wake up to take the second dose. He said he would be "sleeping almost all day" when he missed the second dose. R. 39-40. Dierking said when he took both doses at night, he was "not as bad" the next day. He said, "I can—I can actually get a lot of the clothes washed and folded during the day and

get the house kind of cleaned then."  R. 40.  He still fell asleep once during the next day even if he took both doses the night before.  R. 41.

Dierking said that during the day he cleaned house and fed the animals.  He indicated that the children were all in school.  He said that his wife was a bus driver and took care of "young hospice."  Dierking stated he had no difficulty caring for his personal hygiene and dressing himself.  R. 38.  Dierking's testimony then concluded.

## THE DECISION OF THE ALJ

On March 25, 2016, the ALJ issued his decision.  R. 18-24.  The ALJ followed the five-step analysis set forth in Social Security Administration Regulations (Analysis).  20 C.F.R. §§ 404.1520, 416.920.  Step 1 requires that the claimant not be currently engaged in substantial gainful activity.  20 C.F.R. §§ 404.1520(b), 416.920(b).  If true, Step 2 requires the claimant to have a severe impairment.  20 C.F.R. §§ 404.1520(c), 416.920(c).  If true, Step 3 requires a determination of whether the claimant is so severely impaired that he is disabled regardless of his age, education and work experience.  20 C.F.R. §§ 404.1520(d), 416.920(d).  To meet this requirement at Step 3, the claimant's condition must meet or be equal to the criteria of one of the impairments specified in 20 C.F.R. Part 404 Subpart P, Appendix 1 (Listing).  20 C.F.R. §§ 404.1520(d), 416.920(d).  If

the claimant is not so severely impaired, the ALJ proceeds to Step 4 of the
Analysis.

Step 4 requires the claimant not to be able to return to his prior work
considering his age, education, work experience, and Residual Functional
Capacity (RFC).  20 C.F.R. §§ 404.1520(e) and (f), 416.920(e) and (f).  If
the claimant cannot return to his prior work, then Step 5 requires a
determination of whether the claimant is disabled considering his RFC,
age, education, and past work experience.  20 C.F.R. §§ 404.1520(g),
404.1560(c), 416.920(g), 416.960(c).  The claimant has the burden of
presenting evidence and proving the issues on the first four steps.  The
Commissioner has the burden on the last step; the Commissioner must
show that, considering the listed factors, the claimant can perform some
type of gainful employment that exists in the national economy.  20 C.F.R.
§§ 404.1512, 404.1560(c); Weatherbee v. Astrue, 649 F.3d 565, 569 (7th
Cir. 2011); Briscoe ex rel. Taylor v. Barnhart, 425 F.3d 345, 352 (7th Cir.
2005).

The ALJ determined that Dierking met his burden at Step 1.  He had
not engaged in substantial gainful activity since January 6, 2012.  Dierking
earned money in his lawn mowing business, but not enough to constitute

substantial gainful activity as defined for purposes of the Social Security regulations.

The ALJ determined at Step 2 that Dierking failed to establish that he had a medically determinable impairment that was severe.  The ALJ found that Dierking had obstructive sleep apnea, but found that his sleep apnea did not have more than a minimal effect of his ability to work.  R. 20.  The ALJ found that Dierking responded to routine conservative treatment that resolved any impact of his sleep apnea on his ability to work.  The ALJ relied on the records that showed Dierking's condition was treated effectively with the combination of a CPAP machine and Xyrem medication, on the opinions of Drs. Oh and Gonzalez, and on Dierking's level of daily activity and his part-time work in his mowing business and helping his friends with building projects.  R. 21-23. The ALJ also stated that he had to make a credibility determination regarding Dierking, and specifically found, "The inconsistencies between the claimant's allegations and the medical evidence weaken his credibility."  R. 23.  The ALJ found that Dierking was not disabled at Step 2 of the Analysis because he did not have a severe medically determinable impairment.  R. 23.

Dierking appealed.  On March 27, 2017, the Appeals Council denied Dierking's request for review.  The decision of the ALJ then became the

final decision of the Defendant Commissioner.  R. 1.  Dierking then filed
this action for judicial review.

## ANALYSIS

This Court reviews the Decision of the Commissioner to determine
whether it is supported by substantial evidence.  Substantial evidence is
"such relevant evidence as a reasonable mind might accept as adequate"
to support the decision.  Richardson v. Perales, 402 U.S. 389, 401 (1971).
This Court must accept the findings if they are supported by substantial
evidence, and may not substitute its judgment or reweigh the evidence.
Jens v. Barnhart, 347 F.3d 209, 212 (7th Cir. 2003); Delgado v. Bowen, 782
F.2d 79, 82 (7th Cir. 1986).  This Court will not review the ALJ's evaluation
of statements regarding the intensity, persistence, and limiting effect of
symptoms unless the evaluation is patently wrong and lacks any
explanation or support in the record.  See Pepper v. Colvin, 712 F.3d 351,
367 (7th Cir. 2014); Elder v. Astrue, 529 F.3d 408, 413-14 (7th Cir. 2008);
SSR 16-3p, 2016 WL 1119029, at *1 (2016) (The Social Security
Administration no longer uses the term credibility in the evaluation of
statements regarding symptoms).  The ALJ must articulate at least
minimally his analysis of all relevant evidence.  Herron v. Shalala, 19 F.3d
329, 333 (7th Cir. 1994).  The ALJ must "build an accurate and logical

bridge from the evidence to his conclusion." Clifford v. Apfel, 227 F.3d 863, 872 (7th Cir. 2000).

In this case, the ALJ did not minimally articulate his analysis of all of the relevant evidence. The ALJ did not address whether Dierking had a severe impairment due to Dr. Rai's diagnosis of narcolepsy. The ALJ only stated that Dierking had a medically determinable impairment from obstructive sleep apnea. Dr. Rai initially diagnosed obstructive sleep apnea, but indicated that Dierking might also have primary hypersomnia. R. 371. By Dierking's September 19, 2013, visit, Dr. Rai changed the diagnosis of Dierking's chronic problems to include both narcolepsy and hypersomnia, as well as obstructive sleep apnea. R. 325. The ALJ did not directly address whether Dierking's narcolepsy and hypersomnia were medically determinable impairments, and if so, whether the impairments were severe for purposes of Step 2 of the Analysis

In addition, the ALJ did not explain why he found that Dierking's sleep impairment did not have more than a minimal impact on his ability to engage in work activities from the September 19, 2013 appointment with Dr. Rai until the October 23, 2014 appointment with Dr. Rai. The records support the ALJ's finding that proper use of Dierking's CPAP machine resolved his symptoms sufficiently to render his sleep apnea to be non-

severe at Step 2 prior to the September 19, 2013, appointment.  The
records also support the ALJ's findings that after October 23, 2014, Dr.
Rai's prescription for Xyrem resolved his daytime sleepiness symptoms
sufficiently to render his narcolepsy and hypersomnia non-severe.  The
ALJ, however, did not adequately explain the basis for his Step 2 finding for
the period between September 19, 2013, and October 23, 2014.

Dierking reported significant problems with daytime sleepiness on
September 19, 2013.  His Epworth Sleepiness Scale score on both
September 19, 2013 and October 23, 2014 was 22, which indicated severe
excessive daytime sleepiness.  Dr. Rai prescribed Adderall.  R. 323.
According to Dierking, Dr. Rai gave him a sample of another stimulant
Nuvigil.  R. 323, 198.  Dierking reported that the Nuvigil did not work.  R.
198.  On October 23, 2014, Dr. Rai stated that neither Nuvigil nor Adderall
worked.  R. 354.  His Epworth Sleepiness Scale score remained at 22.

The September 19, 2013, and October 23, 2014 treatment notes
were the only treatment or diagnostic records cited by the parties or the
ALJ between those two dates.  These records may indicate that Dierking
could have had a significant problem with daytime sleepiness from
September 19, 2013, until October 23, 2014, when Dr. Rai first prescribed
Xyrem.  Dierking's statements in his October 10, 2013, Function Report

about his daytime sleepiness during that period were consistent with the medical records from his appointments with Dr. Rai on September 19, 2013, and October 23, 2014.

The period from September 19, 2013, until October 23, 2014, is more than 12 months.  A disability is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment or combination of impairments that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months."  R. 18 (citing 42 U.S.C. § 416(i)).  The medical records from September 19, 2013, to October 23, 2014, could have indicated a Step 2 severe impairment, i.e., an impairment that more than minimally affected Dierking's ability to engage in work-related activities for more than 12 months.  The ALJ did not adequately explain why he found otherwise.

The Commissioner argues that Dierking could have sought treatment during the 13 months from September 2013 to October 2014 and failure to do so disproves disability, particularly because he received an effective treatment, Xyrem, the next time he saw Dr. Rai.  Dierking argues he could not afford to seek medical treatment during these 13 months.  The Commissioner disputes whether Dierking had medical coverage for

appointments with Dr. Rai.  The Commissioner further argues that even if Dierking could not afford to see Dr. Rai, he had the burden to show that he tried to seek medical treatment from free clinics or other cost-effective sources during this time.

Regardless of the merits of the parties' arguments, the ALJ did not address directly Dierking's condition during this 13-month period.  The ALJ should address the issues regarding Dierking's impairments during this period in the first instance.  The failure to address such issues leaves the Court without a clear explanation of his decision.  A remand is appropriate under these circumstances because the ALJ did not minimally articulate his treatment of all of the material evidence.  See Herron, 19 F.3d at 333.

The ALJ also erroneously assessed Dierking's credibility.  The ALJ issued his decision on March 25, 2016.  R. 24.  On March 16, 2016, the Social Security Administration determined that ALJs should no longer use the term credibility in their decisions.  SSR 16-3p, 2016 WL 1119029 (March 16, 2016), at *1.  The ALJ erred by using the term credibility.  R. 21, 23.

This error was harmless.  The Social Security Administration explained in SSR 16-3p that ALJs should not assess "an individual's overall character or truthfulness in the manner typically used during an adversarial

court litigation." SSR 16-3p, 2016 WL 1119029, at *10.  The ALJ did not opine on Dierking's character or overall truthfulness.  The ALJ only assessed Dierking's evidence regarding his limitations in light of the other evidence in the record.  Consideration of all the evidence in the record, including medical evidence and the claimant's statements regarding his symptoms, is appropriate.  SSR 16-3p, 2016 WL 1119029, at *4-*10. Because the matter should be remanded on other grounds, however, the ALJ should comply with SSR 16-3p in subsequent proceedings.

On remand, the ALJ should address whether Dierking's diagnoses of narcolepsy and hypersomnia were severe impairments at Step 2, should address more directly whether the evidence of Dierking's impairments from September 19, 2013, to October 23, 2014, indicate that he had a severe impairment at Step 2, and should comply with the requirements of SSR 16-3p.

THEREFORE, THIS COURT RECOMMENDS that Plaintiff's Motion for Summary Judgment and Memorandum of Law (d/e 9) should be ALLOWED, the Defendant Commissioner's Motion for Summary Affirmance (d/e 10) should be DENIED, and the decision of the Commissioner should be REVERSED and REMANDED under 42 U.S.C. § 405(g) sentence 4.

The parties are advised that any objection to this Report and Recommendation must be filed in writing with the Clerk of the Court within fourteen days after service of a copy of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2).  Failure to file a timely objection will constitute a waiver of objections on appeal.  See Video Views, Inc. v. Studio 21, Ltd., 797 F.2d 538, 539 (7th Cir. 1986).  See Local Rule 72.2.

ENTER:   July 23, 2018

*s/ Tom Schanzle-Haskins*

TOM SCHANZLE-HASKINS
UNITED STATES MAGISTRATE JUDGE